UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | |
|---|---|
| ALYCIA G. KURDILLA, INDIVIDUALLY and as ADMINISTRATOR of the ESTATE of RICKEY J. KURDILLA, DECEASED,<br><br>　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　Defendant. | Civil Action No. _____ |

## COMPLAINT

Alycia G. Kurdilla, Individually and as Administrator of the Estate of Rickey J. Kurdilla, deceased, by counsel, states as follows for her Complaint against Defendant United States of America:

### Jurisdiction and Venue

1.　　This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

2.　　In compliance with 28 U.S.C. § 2675, Mr. Kurdilla, before passing away, filed an administrative tort claim with the Department of Veterans Affairs, which is attached as **Exhibit A**. That claim was received by the Office of Chief Counsel on February 27, 2017.

3.　　Following Mr. Kurdilla's untimely death on March 9, 2019, his daughter, Ms. Kurdilla, in her capacity individually and as administrator of her late father's estate, filed a survival and wrongful death administrative tort claim with the Department of Veterans Affairs, which is attached as **Exhibit B**. That claim was received by the Office of Chief Counsel on February 14, 2020.

1

4. The Department of Veterans Affairs denied this claim on March 2, 2020.

5. Accordingly, Ms. Kurdilla's causes of action are ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the causes of action at issue in this case arose at the H. John Heinz III VA Medical Center ("Pittsburgh VAMC") at 1010 Delafield Road, Pittsburgh, PA 15240-1005.

7. At all times relevant to this action, the United States owned and operated the Pittsburgh VAMC and its affiliated clinics.

8. At all times relevant to this action, the agents, servants, employees, and personnel of the United States were acting within the course and scope of their employment in providing and/or failing to provide medical care and treatment to Mr. Kurdilla.

9. Mr. Kurdilla was a veteran of the United States Navy, and thus was entitled to medical care and treatment at the Pittsburgh VAMC and its affiliated clinics.

10. The care described as follows was provided to Mr. Kurdilla at the Pittsburgh VAMC unless otherwise stated.

11. Appropriate licensed professionals, specifically, Dr. Mitchell Miller, a Board-certified family physician, and Dr. Jack Goldberg, a physician who is Board-certified in internal medicine, hematology, and medical oncology, have supplied signed reports to Ms. Kurdilla's counsel stating that the care, skill, and knowledge exercised and exhibited by Defendant's agents, servants, employees, and personnel in the treatment of Mr. Kurdilla that is the subject of this Complaint deviated from the acceptable professional standard of care and caused the harm and damages alleged.

12. Dr. Miller's expert report is attached as **Exhibit C**. Dr. Goldberg's expert report is attached as **Exhibit D**.

### Allegations

13. Ms. Kurdilla re-states and re-alleges paragraphs 1 through 12 as if fully stated herein.

14. Mr. Kurdilla had a family history of prostate cancer in his father, a personal history of benign prostatic hyperplasia, and had taken medication, including terazosin, to treat the symptoms of prostatic hyperplasia for several years.

15. On February 13, 2004, when he was 50 years old, Mr. Kurdilla was screened for prostate cancer by use of a prostate-specific antigen (PSA) test, which showed his PSA level was normal at 1.25.

16. Mr. Kurdilla was screened again by a PSA test on May 5, 2006, when he was 53, and that test revealed his PSA level was 1.12, still normal.

17. Mr. Kurdilla was screened again on January 17, 2007, when he was less than two months from his 54th birthday, revealing a normal PSA level of 0.88.

18. On July 10, 2008, Mr. Kurdilla was seen by Evleana Blanchard, LPN at the Pittsburgh VAMC. Ms. Blanchard documented that Mr. Kurdilla "was given written information about the benefits and risks of prostate cancer screening and was instructed to discuss any questions or concerns with his or her primary care provider." There is no documentation of any PSA tests being discussed, offered, or performed at this visit.

19. Over the course of the next eight years, Mr. Kurdilla had numerous primary care visits at the Pittsburgh VAMC.

20. During this eight-year period, he was being followed for various conditions at the Pittsburgh VAMC, including hypertension, chronic lung disease, depression, PTSD, and chronic foot, leg, and back pain.

21. Mr. Kurdilla had several visits during this time period that were classified by the Pittsburgh VAMC as "preventative," and dealt with several issues such as alcohol and depression screening, colon cancer screening, and immunizations, and he was offered colonoscopies on several occasions during these visits.

22. Despite this attention to Mr. Kurdilla's chronic problems, multiple visits addressing screening and preventative care, and his high risk for prostate cancer due to his family history and age, Mr. Kurdilla's Pittsburgh VAMC medical providers did not offer or perform another prostate cancer screening, whether by PSA test or digital rectal examination (DRE), for Mr. Kurdilla until April 27, 2016, more than nine years after his last prostate cancer screening.

23. Indeed, on several occasions, Prevention Notes were entered into Mr. Kurdilla's chart that PSA levels were not available.

24. Specifically, on November 23, 2009, Mr. Kurdilla was seen by his primary care provider, Mary Pat Acquaviva, PA-C, but no PSA testing was documented as discussed or offered. David G. Tarr, LPN noted in a "Prevention Note" after this visit, "PSA, Total (BA2) – None Found."

25. Again, on January 28, 2010, Mr. Kurdilla was seen in the primary care clinic by Gaetan Sgro, M.D. and Erika L. Hoffman, M.D. for a routine visit, but no PSA testing was documented as having been discussed or offered. Dawn L. Cogley, LPN also noted after this visit in a Prevention Note, "PSA, Total (BA2) – None Found."

4

26. Notably, on May 13, 2010, Mr. Kurdilla reported to Dr. Sgro and Elif Sonel, M.D. that he had been experiencing increased urinary frequency and urgency and that he had difficulty stopping his stream while urinating.

27. Despite this report of issues with urination, no prostate cancer screening by PSA test, DRE, or any other means, was offered or performed by Dr. Sgro, Dr. Sonel, or any other care provider at the Pittsburgh VAMC as a result of Mr. Kurdilla's May 13, 2010 primary care visit. Drs. Sgro and Sonel documented that Mr. Kurdilla had "no record of previous colonoscopy; not ready yet but amenable to hemoccult testing," but again no PSA testing was documented as having been discussed or offered.

28. Further, no referral to a urologist was offered or made by Dr. Sgro, Dr. Sonel, or any other care provider at the Pittsburgh VAMC as a result of Mr. Kurdilla's May 13, 2010 primary care visit.

29. Following this visit, Dawn L. Cogley, LPN again noted in a Prevention Note, "PSA, Total (BA2) – None Found."

30. On August 5, 2010, Mr. Kurdilla was seen in the primary care clinic by John Ludden, M.D. for a routine follow-up visit. Dr. Ludden noted Mr. Kurdilla's fecal occult blood cards that had been recently tested were negative, but again no PSA testing was documented as having been discussed or offered.

31. Following this visit, on August 12, 2010, Dawn L. Cogley, LPN again noted in a Prevention Note, "PSA, Total (BA2) – None Found."

32. On April 11, 2011, Mr. Kurdilla was again seen by Ms. Acquaviva for a routine primary care follow up visit, but no discussion or offer of PSA testing was documented. Following

5

this visit, Dawn L. Cogley, LPN again noted in a Prevention Note, "PSA, Total (BA2) – None Found."

33. Over the next three years, Mr. Kurdilla had regular routine follow up visits with Ms. Acquaviva in the primary care clinic on at least six occasions, but discussion or an offer of PSA testing was never documented. Additionally, no further Prevention Notes were entered into Mr. Kurdilla's chart.

34. On June 30, 2014, Mr. Kurdilla reported to Mary Pat Acquaviva PA-C during a routine visit that he had no appetite and stated "that 'I'm dying' from something."

35. Less than a year later, on July 20, 2015, Mr. Kurdilla was seen by Alex A. Despines, a PA student, supervised by Ms. Acquaviva, at which time Mr. Kurdilla further complained of unexplained weight loss during the previous six months. Mr. Kurdilla stated that "he has lost 30 lbs. in the past 6-months."

36. At this July 20, 2015 visit, Mr. Kurdilla also reported polyuria, increased frequency, urgency, and hesitancy while urinating to Mr. Despines and Ms. Acquaviva.

37. Despite the urination issues and Mr. Kurdilla's unintentional weight loss, no prostate cancer screening of any kind was offered by any VA care provider at the Pittsburgh VAMC as a result of his June 30, 2014 or July 20, 2015 visits.

38. Likewise, no referral to a urologist was offered or made by any VA care provider at the Pittsburgh VAMC as a result of these visits.

39. On April 27, 2016, Mr. Kurdilla presented to Joseph Sapp, CRNP at the Pittsburgh VAMC primary care clinic, who noted that Mr. Kurdilla needed benign prostatic hyperplasia medication or he "will have problems," and ordered blood tests, which include—for the first time in nine years–a PSA test.

40. Mr. Kurdilla's April 27, 2016 PSA test revealed a PSA of 68.44, which is extraordinarily and dangerously high.

41. On May 17, 2016, Mr. Kurdilla underwent a CT of his chest and abdomen, which revealed a "[m]oderately enlarged prostate gland" and "[e]vidence of bilateral pelvic sidewall lymphadenopathy, large measuring 2.7 cm x 1.5 cm on the left side and prominent 1.5 cm lymph node on the right side."

42. On May 17, 2016, Mr. Kurdilla was finally afforded a urology consult performed by Janice Jones, CRNP, CUNP, during which a DRE was performed and repeat PSA test was undertaken.

43. The May 17, 2016 DRE revealed a "45-50 gm prostate, nodule noted L mid, firm along outer edge of L side."

44. The May 17, 2016 PSA test still revealed a very elevated PSA of 67.06.

45. Notably, Ms. Jones documented that over the last year Mr. Kurdilla had lost 27 pounds, and that "this was attributed to his PTSD, although he doesn't agree."

46. On May 24, 2016, Mr. Kurdilla underwent a prostate biopsy, which revealed on May 26, 2016, "prostatic adenocarcinoma, acinar type, Gleason grade 4 + 5 = score 9" in the left base of his prostate and "prostatic adenocarcinoma, acinar type, Gleason grade 4 + 4 = score 8" in the left apex of his prostate.

47. On June 17, 2016, Mr. Kurdilla received a hematology/oncology consult with Andrew D. Liman, M.D. who noted that "about 9 months ago he complained to his PCP that he had lost more than 20 lbs. He was told maybe due to his PTSD."

7

48. Mr. Kurdilla was thereafter followed and treated by hematology/oncology at the Pittsburgh VAMC. He began Eligard injections on June 17, 2016 and began taking bicalutamide on September 8, 2017 and enzalutamide on July 13, 2018.

49. On October 31, 2018, a CT scan revealed the development of "numerous diffuse osseous metastatic lesions" through Mr. Kurdilla's entire spine, his pelvis, and his ribs.

50. An October 31, 2018 bone scan further revealed "innumerable metabolically active metastasis throughout the skull, cervical spine, thoracolumbar spine, pelvis, ribs, and sternum."

51. In November 2018, Mr. Kurdilla was placed on palliative care with a plan for radium 223, which was initiated on November 9, 2018.

52. During palliative care, Mr. Kurdilla was prescribed several opioid pain medications, including Vicodin, fentanyl, and Dilaudid. However, Mr. Kurdilla continued to have severe pain throughout his body.

53. On December 13, 2018, Mr. Kurdilla reported to the Pittsburgh VAMC with shortness of breath and a CTA discovered bilateral subsegmental pulmonary emboli which was "likely cancer related."

54. By January 4, 2019, Mr. Kurdilla had unintentionally lost an additional 40 pounds due to his cancer.

55. On January 25, 2019, Mr. Kurdilla was placed on hospice care.

56. Mr. Kurdilla remained on hospice care until he died from the metastatic prostate cancer on March 9, 2019, just two days after his 66th birthday.

57. Mr. Kurdilla's death certificate lists the immediate and only cause of death as "Prostate Cancer."

58. Care providers at the Pittsburgh VAMC failed to provide Mr. Kurdilla any prostate cancer screening for more than nine years between January 17, 2007 and April 27, 2016.

59. Because of this failure to provide prostate cancer screenings for more than nine years, despite repeated urinary complaints, a family history of prostate cancer, and unintentional weight loss, Mr. Kurdilla's prostate cancer was allowed to develop to an advanced stage and metastasize.

60. Because of this delayed diagnosis and treatment of Mr. Kurdilla's prostate cancer until it had progressed to an advanced stage and metastasized, Mr. Kurdilla suffered progressive and extreme pain throughout his body until his death.

61. But for Pittsburgh VAMC care providers' failure to timely provide prostate cancer screening, Mr. Kurdilla's cancer would have been detected earlier, curative treatments would have been provided, and his life spared and survival time significantly increased.

62. Mr. Kurdilla's death was a direct and proximate result of the negligent care provided by his healthcare providers and staff at the Pittsburgh VAMC.

## **Negligence**

63. Ms. Kurdilla re-states and re-alleges paragraphs 1 through 62 as if fully stated herein.

64. As a provider of medical services to Mr. Kurdilla, the United States and its agents, servants, or employees at the Pittsburgh VAMC and its affiliated clinics owed Mr. Kurdilla a duty to provide him care consistent with the governing standard of medical care.

65. The agents, servants, or employees of the United States at the Pittsburgh VAMC and its affiliated clinics, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

      a.    Negligent failure to provide proper and timely prostate cancer counseling and screening, to include PSA tests or DREs or both, between January 17, 2007 and April 27, 2016;

      b.    Negligent failure to investigate Mr. Kurdilla's urinary complaints and unintentional weight loss;

      c.    Negligent failure to provide a urology consult for Mr. Kurdilla's urinary complaints and unintentional weight loss;

      d.    Negligent delay in diagnosing and providing appropriate treatment for Mr. Kurdilla's prostate cancer; and

      e.    Other negligent acts or omissions will be developed through additional factual investigation, expert review, and discovery.

## Count I – Wrongful Death

66.    Ms. Kurdilla re-states and re-alleges paragraphs 1 through 65 as if fully stated herein.

67.    As a direct and proximate results of the negligence of the agents, servants, and employees of Defendant, Mr. Kurdilla died on March 9, 2019.

68.    Had Mr. Kurdilla been timely and appropriately counseled, diagnosed, and treated for his prostate cancer, he would have been cured and survived.

69.    Accordingly, Ms. Kurdilla claims the following damages:

    a. Hospital, nursing, medical, funeral, and burial expenses;

    b. Loss of income, financial support, contributions, and services;

    c. Loss of care, comfort, society, community, attention, affection, guidance, tutelage, moral support, and upbringing; and

      d.    Compensation for any other damages sustained as a proximate result of Defendant's negligence.

70. For these damages, Ms. Kurdilla demands monetary relief in an amount deemed appropriate and just by the Court.

### Count II - Survival

71. Ms. Kurdilla re-states and re-alleges paragraphs 1 through 70 as if fully stated herein.

72. As a direct and proximate result of the negligence of the agents, servants, and employees of Defendant, Mr. Kurdilla was caused to suffer physical injury, pain, mental anguish, physical disability, and related damages.

73. Accordingly, Ms. Kurdilla claims the following damages:

      a.    Compensation for the mental and physical pain, suffering, inconvenience, mental anguish, and loss of life's pleasures of Mr. Kurdilla prior to his death;

      b.    Loss of past and future earnings and earning capacity of Mr. Kurdilla;

      c.    Compensation for any other damages sustained as a proximate result of Defendant's negligence.

74. For these damages, Ms. Kurdilla demands monetary relief in an amount deemed appropriate and just by the Court.

WHEREFORE, Plaintiff requests that the Court grant judgment in her favor against Defendant in the amount of Five Million Dollars ($5,000,000.00), together with any other costs she may be lawfully entitled to recover.

Respectfully submitted,

SCANLON & WOJTON, LLC

By: _____
Matthew J. Scanlon, Esq.
Counsel for Plaintiff
The Mitchell Building
304 Ross Street, Suite 510
Pittsburgh, PA 15219
(412) 918-1241-office
(412) 330-8137-mobile
(412) 235-7275-facsimile
matt@swlegalteam.com
www.swlegalteam.com