# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PETERS TOWNSHIP SCHOOL DISTRICT:

   Plaintiff,

 v.            Civil Action No.

B.B., a minor, and his parents,
D.B. and D.B.,

   Defendants

## COMPLAINT

AND NOW, comes the Plaintiff, Peters Township School District, by and through its undersigned counsel, Rebecca Heaton Hall, Esquire, Emily Hammel, Esquire, and the law firm of Weiss Burkardt Kramer, LLC, and hereby files the following Complaint, and avers as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under the Individuals with Disabilities Education Improvement Act (hereinafter "IDEA"). 20 U.S.C. §1400.

2. Plaintiff, Peters Township School District (hereinafter "School District"), has exhausted its remedies under the provisions of the IDEA by participating in an impartial due process hearing as required by 20 U.S.C. §1415(f). A true and correct copy of the July 21, 2020, Decision is attached and marked "Exhibit A."

3. Venue lies within this judicial district as each of the actions complained of occurred within the Western District of Pennsylvania.

**PARTIES**

4.     Plaintiff School District is a municipal corporation within the Commonwealth of Pennsylvania with a principal place of business at 631 East McMurray Road, McMurray, Pennsylvania 15317.

5.     Defendant B.B. is a student in the School District and is protected by the IDEA as a student with a disability.

6.     Defendants, father D.B. and mother D.B., are the parents and natural guardians of B.B. who reside within the Plaintiff School District's geographical boundaries. B.B., father D.B., and mother D.B. are hereinafter collectively referred to as "Defendants."

**FACTUAL BACKGROUND**

7.     Due to a primary disability category of Emotional Disturbance, B.B. has remained eligible for special education services under the IDEA since February 2018.

8.     During the 2017-2018 school year, B.B. was a seventh-grade student at the Peters Township Middle School.

9.     Due to a series of unexcused absences in the spring of 2017 B.B.'s initial special education evaluation was initiated.

10.    While the evaluation was pending, B.B.'s parents withdrew him from the School District and enrolled him in a cyber charter school. After B.B. did not engage in the cyber charter program, B.B.'s parents re-enrolled him in the School District.

11.    To evaluate B.B., the School District's school psychologist made attempts to meet with B.B. and his parents at two (2) different School District buildings and the local library. Despite these attempts, B.B. refused to meet with the school psychologist.

Ultimately, the school psychologist made arrangements to perform the evaluation at B.B.'s home.

12. Upon arrival at B.B.'s home, despite attempts to talk to B.B., he refused to come out of his bedroom. Given B.B.'s continued refusal, the school psychologist was unable to perform assessments of B.B. for the initial evaluation.

13. To gain information about B.B., the school psychologist obtained input from his teachers, parents, guidance counselor, principal, and school nurse. The school psychologist had two (2) of B.B.'s teachers complete the Scales for Assessing Emotional Disturbance – Second Edition (SAED-2) and Behavior Assessment System for Children – Third Edition (BASC-3). B.B.'s parents completed the BASC-3 Parent Rating Scales. A thorough consideration was made of B.B.'s academic history, strengths, and needs.

14. On February 6, 2018, B.B.'s Evaluation Report was timely provided to his parents.

15. On February 8, 2018, B.B. was admitted to Mercy Behavioral Health Child and Adolescent Diversion and Acute Stabilization Program (hereinafter "Mercy DAS"). Mercy DAS is a short-term, crisis intervention program that provides inpatient services for several weeks. On February 19, 2018, B.B.'s father discharged him against medical advice.

16. A report from Mercy DAS was later provided to the School District and School District personnel had a follow-up conversation with Mercy DAS to discuss B.B.'s diagnoses and treatment.

17. Based upon the Mercy DAS discharge report and follow-up conversation, the School District was informed that B.B. was diagnosed with adjustment disorder with mixed anxiety and depression.

18. The School District remained concerned with B.B.'s attendance and retained the Youth Advocacy Program (hereinafter "YAP) to provide intensive truancy services. YAP was also retained to provide intensive truancy services to B.B.'s two (2) siblings and support his parents.

19. On March 2, 2018, the multidisciplinary team convened, which included B.B.'s parents, and determined that he met eligibility for special education as a student with an Emotional Disturbance. The team discussed the Mercy DAS report and diagnoses, and B.B.'s parents confirmed his diagnoses of adjustment disorder with mixed anxiety and depression. The team developed an IEP and issued a request for B.B.'s parents to provide consent to perform a functional behavioral assessment (hereinafter "FBA").

20. Throughout the evaluation process and continuing to the end of the school year, B.B. had regular access to the school guidance counselor.

21. An April 30, 2018, FBA and a May 1, 2018, Reevaluation Report were generated. The IEP Team convened and agreed upon a May 11, 2018, IEP that included a positive behavior support plan (hereinafter "PBSP").

22. On May 11, 2018, YAP discharged B.B. from their program. While the YAP truancy program provided B.B. and his family with intensive support, B.B.'s attendance remained intermittent. YAP noted many concerns regarding the family's ability to get B.B. to attend school. YAP's concerns included observations of him barricading the door to his bedroom, threatening his parents, and exhibiting aggression. When B.B. was at school, no concerns were noted regarding physical or verbal aggression.

23. On June 11, 2018, B.B. was evaluated by a private clinical neuropsychologist and licensed psychologist (hereinafter "neuropsychological evaluation"). A report was issued and later provided to the School District.

24. The neuropsychological evaluation reported that B.B.'s bedroom was his "sanctuary" and that when his parents come to his room to get B.B. to attend school, he becomes upset and has been verbally and physically aggressive.

25. The neuropsychological evaluation contained a variety of assessments including the Autism Spectrum Rating Scales (ASRS) and Asperger Syndrome Diagnostic Scale (ASDS). The results of the ASRS and ASDS were entirely within normal limits.

26. The neuropsychological evaluation diagnosed B.B. with an unspecified anxiety disorder, oppositional defiant disorder, and unspecified depressive disorder. The evaluation explicitly ruled out a diagnosis of autism spectrum disorder.

27. From January 2018 to June 2018, B.B. was absent without excuse thirty-seven (37) days and tardy nineteen (19) days.

28. During his seventh-grade year, he did not attend mental health therapy consistently.

29. Throughout seventh grade, neither B.B. nor his parents mentioned a possible diagnosis of autism spectrum disorder.

30. In 2018, B.B. enrolled in summer school for credit recovery and was then promoted to the eighth grade.

31. For the 2018-2019 school year, B.B. was an eighth-grade student.

32. At the start of his eighth-grade year, B.B. began missing school. In response, the School District and B.B.'s parents met and discussed changing his educational placement to a setting with increased supports. On September 23, 2018, B.B.'s psychiatrist wrote a letter recommending an acute partial hospitalization program. At the beginning of October 2018, he began attending the Bentworth School District's partial hospitalization program (hereinafter "Bentworth program").

33. Students at the Bentworth program receive educational services from the Bentworth School District and mental health services through the Centerville Clinic. The two (2) entities work together to meet a student's needs in an outpatient setting. Access to student records and information in the school setting is governed by the Family Education Rights Privacy Act (hereinafter "FERPA") and access to information in a clinical setting such as Centerville Clinic is governed by the Health Insurance Portability Privacy Act (hereinafter "HIPPA"). The two (2) entities share information on a need to know basis to best serve a child's educational, medical, and mental health needs.

34. While B.B. attended the Bentworth program, the Centerville Clinic therapist attended his IEP Team meetings and provided input. B.B. also met with the Centerville Clinic psychiatrist on a regular basis, but because of confidentiality requirements, the psychiatrist's reports and diagnostic impressions were not provided to the school program.

35. During the recent due process hearing sessions, the School District was provided for the first time with the Centerville Clinic records which included diagnoses of generalized anxiety disorder, depressive disorder, and autism spectrum disorder. The psychiatrist from Centerville Clinic did not administer any assessments.

36. On October 31, 2018, the School District issued a Reevaluation Report with updated information from B.B.'s transition to the Bentworth program. The IEP Team, including B.B.'s parents, convened on November 2, 2018, to revise his current IEP. At this meeting, a possible diagnosis of autism spectrum disorder was not discussed.

37. During eighth grade, B.B. remained at the Bentworth program and experienced periods of increased and decreased school attendance. In January 2019, the School District developed a School Attendance Improvement Plan and referred the family for truancy support services. Given continued concerns with truancy, in March 2019, the School District filed a truancy notice with the local magistrate. Once the truancy charge was filed, B.B.'s attendance increased, and the truancy matter was dismissed by the magistrate. While at the Bentworth program, B.B. missed forty-four (44) days of school and was tardy seventy-two (72) times.

38. At the due process hearing, the Bentworth program special education teacher testified that B.B. did not exhibit any of the signs or symptoms of autism spectrum disorder in the school program. The special education teacher testified that the program provided to B.B. met his needs.

39. During eighth grade, neither B.B. nor his parents mentioned a possible diagnosis of autism spectrum disorder to the School District.

40. B.B. was promoted to the ninth grade with passing grades in all classes except science.

41. In May and June of 2018, the IEP Team convened multiple times to discuss plans for B.B.'s ninth-grade year. The IEP Team included B.B., his parents, the School District, representatives from the Bentworth program, and the therapist from Centerville Clinic.

42. All individuals at the IEP Team meetings except B.B. and his parents recommended that he should remain at the Bentworth program for the ninth grade. After B.B. and his parents refused continued placement at Bentworth, the School District offered a transition plan of a half-day at the Peters Township High School and a half-day at the Bentworth program. B.B. and his parents also refused the transition option and maintained that he would only attend the ninth grade at the Peters Township High School.

43. On June 12, 2019, the School District completed a Reevaluation Report with updated input from the Bentworth program and BASC-3 rating scales completed by three (3) teachers. Although B.B.'s parents were asked to fill out BASC-3 rating scales, they did not return the forms to the School District. The results of the BASC-3 noted significant improvements from the original BASC-3 in February 2018. B.B. and his parents did not participate in testing sessions.

44. On June 17, 2019, the IEP Team convened and revised B.B.'s IEP and PBSP. The IEP provided for special education classes in English and mathematics, special education study halls, and general education classes for the rest of his classes.

45. During the 2019-2020 school year, B.B. was a ninth-grade student at the Peters Township High School.

46. Throughout the first quarter of B.B.'s ninth-grade year, he and his parents requested various schedule changes. Many of the changes requested by B.B. and his parents were acquiesced by the School District because they wanted B.B. to remain motivated to attend school.

47. The IEP Team, including B.B.'s parents, revised the June 17, 2019, IEP and PBSP four (4) times (August 19, 2019, September 5, 2019, October 3, 2019, and October 31, 2019) between the initial development date and subsequent IEP dated January 28, 2020. The School District made attempts to schedule additional revision meetings in December of 2019 and the beginning of January 2020, but B.B.'s parents and their attorney canceled or rescheduled the meetings.

48. In September 2019, B.B. had six (6) unexcused absences, in October 2019 he had fifteen (15) unexcused absences, in November fourteen (14) unexcused absences, and in December fourteen (14) unexcused absences. The bulk of his absences occurred after an October 31, 2019, IEP Team meeting where the School District recommended increased special education supports against B.B.'s wishes.

49. The School District again referred the family for truancy prevention services and developed an October 3, 2019, School Attendance Improvement Plan. Shortly after the truancy prevention service referral, B.B.'s parents discontinued the service. The service worker confirmed that B.B. would lock himself in his bedroom when his parents told him to go to school.

50. At the October 31, 2019, IEP Team meeting, B.B.'s parents signed their consent to perform a new FBA.

51. In November 2019, the School District received a letter dated November 8, 2019, from B.B.'s psychiatrist indicating diagnoses of anxiety, depression, and autism spectrum disorder. The letter from the psychiatrist was the first notice that the School District had that there was a formal diagnosis of autism spectrum disorder. Of note, the School District has received the identical letter from the psychiatrist for at least one other student, with the only difference being the change in the student's name.

52. Before the November 8, 2019, letter, B.B. and his parents had not mentioned a diagnosis of autism spectrum disorder, except on one occasion in an October 28, 2019, email from B.B.'s father. His father was adamant that the autism spectrum disorder diagnosis should not be mentioned in B.B.'s presence.

53. On December 20, 2019, the School District issued an FBA identifying primary concerns of school attendance, work completion, and task avoidance. The FBA considered each of the private reports provided by B.B.'s parents and performed a comprehensive educational record review and analysis.

54. On December 19, 2020, the School District arranged for an interagency meeting with B.B.'s parents and a variety of service providers in the community that could provide additional support to B.B. in his community and home. As a result of the interagency meeting, B.B. underwent a January 2, 2020, private psychological evaluation performed by Larry Sutton, Ph.D. (hereinafter "Sutton Report").

55. The Sutton Report indicated that B.B. had stopped taking his prescribed medications two (2) weeks ago and was not engaging in mental health therapy. The report noted that B.B. "has a TV and his gaming computer" in his bedroom and spends at least twenty (20) hours in his room per day.

56. The Sutton Report included the Beck Depression Inventory, Second Edition which scored B.B. at a minimal range of depression symptoms and the Beck Hopelessness Scale which scored B.B. at a mild range.

57. The Sutton Report also contained the Asperger Syndrome Diagnostic Scale which resulted in a "likely" finding of Asperger syndrome with a notation that "Asperger syndrome is no longer a diagnosable syndrome." The School District was not asked to provide input or complete rating scales for the evaluation.

58. The IEP Team convened on January 28, 2020, to review the FBA and develop a new IEP and PBSP. Based upon conversations with B.B.'s parents, on January 13, 2020, the School District revised its data collection method and the special education case manager provided support to staff to implement the change. A transition plan was also developed for B.B. to have shortened school days with a gradual transition into a full class schedule.

59. The IEP Team convened on March 13, 2020, to discuss any needed revisions and B.B.'s progress. Within hours of the IEP Team meeting, the Commonwealth closed all schools due to the Covid-19 pandemic. The School District issued a Notice of Recommended Educational Placement for continuation of B.B.'s programming utilizing distance learning. Despite numerous attempts by the School District, B.B. engaged in a limited number of virtual sessions and completed minimal school work.

60. Throughout B.B.'s ninth-grade year, he had access and regular sessions with the school social worker.

61. On December 30, 2019, B.B.'s parents filed a due process complaint.

62. The due process complaint did not mention a diagnosis of autism.

63. On July 21, 2020, the Hearing Officer issued a decision.

## COUNT I

**The Hearing Officer erred when he found that the School District owed one hundred (100) hours of compensatory education when he explicitly ruled that the School District provided B.B. with a free appropriate public education.**

64. Plaintiff hereby incorporates the allegations of the foregoing paragraphs into Count I.

65. Plaintiff alleges that the Hearing Officer erred when he ordered the School District to provide one hundred (100) hours of compensatory education when he explicitly found that "the record *clearly* supports a determination that the District throughout the student's programming over the period January 2018 through the date of this record has provided a program reasonably calculated to provide the student with [a] free appropriate public education." (emphasis added).

66. In contradiction to the Hearing Officer's strong declaration that the School District provided B.B. with a free appropriate public education (hereinafter "FAPE"), the Hearing Officer indicated later in his July 21, 2020, decision, that the School District should have attempted to perform an assessment for a possible classification of autism spectrum disorder in its February 6, 2018, Evaluation Report.

67. In contemplating his statement that the School District should have performed an assessment regarding autism spectrum disorder, the Hearing Officer outlined that the School District "did not overlook glaring signals that it was not assessing in all areas of potential disability," that none of the professionals during that period who evaluated B.B. voiced any concerns regarding autism, and that a June 2018

neuropsychological report "found no basis for diagnosing autism, in fact explicitly assessing for it and ruling it out."

68. In further contradiction, the Hearing Officer went on to explain that even if the School District had attempted to evaluate B.B. for autism, "the student would have been entirely unavailable to engage in the assessment."

69. In light of the Hearing Officer's finding that the School District provided B.B. with a FAPE, his criticism of the School District for not assessing the potential of autism spectrum disorder in the February 2018 Evaluation Report is at most a procedural error that does not amount to a substantive denial of FAPE.

WHEREFORE, Plaintiff School District demands that the Hearing Officer's award of one hundred (100) hours of compensatory education be reversed.

## COUNT II

**The Hearing Officer erred when he ordered placement of B.B. in a therapeutic program with the potential for later placement in a residential facility.**

70. Plaintiff hereby incorporates the allegations of the foregoing paragraphs into Count II.

71. Plaintiff School District alleges that the Hearing Officer erred when he ordered placement of B.B. in a therapeutic school with all costs, educational or noneducational, to be paid by the School District.

72. On multiple occasions, the School District recommended B.B.'s placement in a therapeutic setting, to which B.B. and his parents have rejected.

73. In their due process complaint, B.B. alleged that therapeutic programs were not the least restrictive environment for B.B.

74. The Hearing Officer explicitly found that the School District provided B.B. with a FAPE from January 2018 to the date of the decision.  Given this finding of FAPE, B.B.'s placement in a therapeutic program with all costs to be borne by the School District is punitive and an error of law.

75. The Hearing Officer then ordered that if B.B.'s attendance drops below sixty-six (66) percent within a thirty (30) school day rolling average, the School District must convene the IEP Team to consider whether a residential hospitalization program is appropriate.

76. In their due process complaint and at IEP Team meetings, B.B.'s parents have never requested placement of B.B. in a residential setting.  The School District has also never received a recommendation from B.B.'s mental health providers recommending a residential placement.

77. The School District lacks the authority to remove or recommend removal of a student from their home.  When students are truant, the School District adheres to the truancy laws of the Commonwealth which does not include the authority of a school district to remove a child from the home.  24 PS 13-1333.1.

78. The Hearing Officer further ordered that if B.B.'s parents refuse to sign releases for B.B.'s admission into a residential facility, the School District is no longer obligated to provide B.B. with a FAPE and must only implement the January 2020 IEP. This order contravenes the purpose of the IDEA and Pennsylvania Code in that school districts are required to provide students with a FAPE in the least restrictive environment.

WHEREFORE, Plaintiff School District demands that the Hearing Officer's order pertaining to placement of B.B. in a therapeutic program or residential program is reversed.

### COUNT III

**The Hearing Officer erred when he ordered a comprehensive independent autism evaluation.**

79. Plaintiff hereby incorporates the allegations of the foregoing paragraphs into Count III.

80. Plaintiff alleges that the Hearing Officer erred when he ordered a comprehensive independent autism evaluation.

81. By the Hearing Officer's own admission, B.B. made himself unavailable each time the School District attempted to evaluate him.

82. By his own admission, the Hearing Officer found that there were no signals to the School District that B.B. had autism spectrum disorder, and the neuropsychological evaluation expressly ruled autism spectrum disorder out as a diagnosis.

83. The Hearing Officer further ruled that B.B., his parents, nor outside providers had not notified the School District of a diagnosis of autism spectrum disorder until D.B.'s October 28, 2019, email and November 8, 2019, letter from B.B.'s psychiatrist.

84. If the Hearing Officer believed that B.B. should be evaluated to determine whether he met eligibility criteria as a student with autism spectrum disorder, the School District should have the first opportunity to perform the evaluation.

WHEREFORE, Plaintiff School District demands that the Hearing Officer's order for an independent autism evaluation is reversed.

Respectfully submitted,

By: *Rebecca Heaton Hall*
Rebecca Heaton Hall, Esquire
Pa. ID. No.: 203137
rheatonhall@wbklegal.com

By: *Emily V. Hammel*
Emily Hammel, Esquire
Pa. ID. No.: 316033
ehammel@wbklegal.com

**WEISS BURKARDT KRAMER**
445 Fort Pitt Blvd., Suite 503
Pittsburgh, Pennsylvania 15219
412.391.9890

# CERTIFICATE OF COMPLIANCE

### RE:  ACCESS TO COURT CASE RECORDS

**Case No.:**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully Submitted,

**WEISS BURKARDT KRAMER LLC**

Signature: *Rebecca Heaton Hall*

Printed Name:  Rebecca Heaton Hall

Attorney No. (if applicable):  203137

Phone No.:  412-391-9890