UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>MICHAEL SULLIVAN,<br><br>　　　　　Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:  Civil No.<br>:<br>:<br>:<br>:<br>:<br>: |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its Complaint against Defendant Michael Sullivan, alleges as follows:

## SUMMARY

1. This action involves insider trading by Defendant Michael Sullivan.

2. From 2013 until 2020, Sullivan was employed at Dick's Sporting Goods, Inc. ("Dick's" or "the Company"), a publicly traded company listed on the New York Stock Exchange. As an employee in Dick's Product Development group, and then the Company's Finance Department, Sullivan was privy to material, non-public information concerning Dick's, specifically non-public sales data.

3. From August 17 to 27, 2018, while Dick's was still preparing its earnings announcement for the second financial quarter of 2018 (Q2 2018), Sullivan purchased 100 put option contracts on Dick's securities. Generally, put options increase in value if the price of the underlying stock declines. When Dick's announced its earnings for Q2 2018, its stock price declined more than 9%, and Sullivan sold his entire put option position for profits of $11,500.

4. From November 8 to 25, 2019, while Dick's was still preparing its earnings announcement for the third financial quarter of 2019 (Q3 2019), Sullivan purchased 132 call option contracts on Dick's securities. Generally, call options increase in value if the price of the underlying stock increases. When Dick's announced its earnings for Q3 2019, its stock price increased more than 18%, and Sullivan sold his call options for profits of more than $26,000.

5. On both occasions, Sullivan was subject to Dick's trading blackout period, under which Dick's corporate employees were not permitted to buy or sell Dick's securities, including options. Prior to both his August 2018 trading and his November 2019 trading, Sullivan received an e-mail notice that the blackout period had commenced and that he was prohibited from trading.

6. Throughout his employment at Dick's, Sullivan annually certified Dick's Code of Ethics (the "Code"), which prohibited insider trading and referenced the Company's Insider Trading Policy. In May 2019, Sullivan participated in insider trading training and signed Dick's Insider Trading Policy, which prohibits insider trading and trading during a blackout period.

7. In total, Sullivan realized more than $37,000 in profits from his insider trading in Dick's securities.

8. By engaging in the conduct described above, Sullivan violated Section 10(b) of the Securities Exchange Act of 1934 [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*], and unless restrained and enjoined will continue to do so. Accordingly, the Commission seeks a Final Judgment enjoining Sullivan from future violations of these same provisions of law and ordering Sullivan to pay a civil monetary penalty.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*].

10.     Venue in this district is proper pursuant to Section 27(a) of the Exchange Act [*15 U.S.C. §§ 78aa(a)*].  Certain of the purchases and sales of securities and acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Western District of Pennsylvania, and were effected, directly or indirectly, by making use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Specifically, as described in this complaint, Sullivan purchased Dick's securities in this District.  Sullivan's primary residence is also in this District.

## DEFENDANT

11.     **Defendant Michael Sullivan**, age 58, resides in Pittsburgh, Pennsylvania.  From 2013 to 2020, he worked in various capacities at Dick's, including as a Senior Planner and Project Manager and then as a Senior Financial Planner.

## COMMONLY-USED TRADING TERMS

12.     A stock option, commonly referred to as an "option," gives its purchaser/holder the option to buy or sell shares of an underlying stock at a specified price (the "strike price") before a specified time (the "expiration").  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.  If the holder does not exercise the option prior to the expiration date, the option expires as worthless.

13.     A "call" option, such as those purchased by Sullivan, gives the purchaser/holder of the option the right, but not the obligation, to purchase a security at a specified strike price

prior to expiration. For example, one "October 2020 $72" call on ABC Co.'s shares would give the purchaser the right to buy 100 ABC shares for $72 per share before the call option expired on a specified date in October 2020. Generally, the buyer of a call option anticipates that the price of the underlying security will increase prior to expiration. If the call option's strike price is above the price at which the underlying stock is trading, the call option is considered to be "out of the money," because it would be unprofitable to exercise the call and pay more for the stock than the price for which it could be obtained in the market. Conversely, if the strike price is below the then-current market price, the call is considered to be "in the money," because one could exercise the option, obtain the stock at the strike price, and then sell it at the higher market price for a profit. For a given expiration month, out of the money options are typically cheaper to buy than those that are in the money.

        14.     A "put" option, such as other options purchased by Sullivan, gives the purchaser/holder of the option the right, but not the obligation, to sell a security at a specified strike price prior to expiration. For example, one "October 2020 $72" put on ABC Co.'s shares would give the purchaser the right to sell 100 ABC shares for $72 per share before the put option expired on a specified date in October 2020. Generally, the buyer of a put option anticipates that the price of the underlying security will decrease prior to expiration. If the put option's strike price is below the price at which the underlying stock is trading, the put option is considered to be "out of the money," because it would be unprofitable to exercise the put and sell the stock at a lower price than the price for which it could be sold in the market. Conversely, if the strike price is above the then-current market price, the put is considered to be "in the money," because one could exercise the option and sell the stock at the higher strike price for a profit. For a given

expiration month, out of the money options are typically cheaper to buy than those that are in the money.

## FACTS

### *Sullivan Had a Duty to Dick's and its Shareholders*

15.     Sullivan joined Dick's in 2013.  That year and each year through 2019, Sullivan completed required training on the Code.  The Code specifically prohibits insider trading and refers the reader to the Insider Trading Policy for more detail.  Dick's training related to the Code specifically addressed the prohibition on insider trading during certain years, including 2018.  3In 2013 and 2017-2019, the training required the participant to acknowledge that he had read the Code and that he would comply with the Code, which Sullivan did.

16.     In May 2019, Sullivan also completed training dedicated to the Company's Insider Trading Policy. In completing the Insider Training Policy, Sullivan confirmed that he had read the Insider Trading Policy and that he would comply with it.

17.     Dick's Insider Trading Policy prohibited employees from buying or selling Dick's securities, including options, while in the possession of material, non-public information.  The policy includes examples of material, non-public information, including quarterly earnings information, financial guidance, information relating to major merchandising initiatives, information and developments relating to branded offerings, and other financial metric information that a reasonable investor would consider important in deciding whether to buy, sell, or hold Dick's securities.

18.     Employees were prohibited from trading in Dick's securities at any time during a trading blackout period, which typically began fifteen calendar days before the end of any fiscal

quarter and ended one full trading day after Dick's earnings release has been made public for that period.

19. For both Q2 2018 and Q3 2019, Sullivan received notification at the start of the blackout period that he was prohibited from trading Dick's securities and provided with a link for employees to review the Insider Trading Policy.

### *Sullivan's Q2 2018 Trades*

20. In January 2015, Sullivan began working as a Senior Planner and Project Manager in Dick's Product Development Group. Among his responsibilities were collaborating with the department vice president on various aspects of Dick's private-label brands. Among other responsibilities, Sullivan reviewed and reported on private-label brands sales penetration, which required analyzing a brand's sales compared to its sales potential. Sullivan prepared weekly reports for others in the Product Developments group that included current, non-public sales numbers.

21. Sullivan had access to and necessarily reviewed Dick's sales information on a regular basis to perform his job.

22. Starting in 2017, Sullivan was made aware that Dick's had begun a corporate initiative focusing on private-label brands. Sullivan was aware of the importance of the private-label brands initiative for the Company.

23. On July 20, 2018, Sullivan received a blackout period notification sent to his Dick's e-mail account. The notification warned employees that they were prohibited from trading Dick's securities.

24. Dick's Q2 2018 closed on August 4, 2018. Earnings were not announced until August 29, 2018. During this time period, Sullivan was in possession of non-public Dick's sales information that would later be included in Dick's Q2 2018 public earnings announcement.

25. Nonetheless, during the month of August, Sullivan purchased a number of Dick's put options. Sullivan's trades were effectively a bet that Dick's stock price would decline. In total, Sullivan purchased 100 options contracts spending more than $16,000, including trades made on margin, to put on his position.

26. Sullivan purchased the following put options from August 17 to August 27, 2018, all while subject to Dick's blackout period while in possession of material, non-public information:

| Date | Option Purchased | Quantity | Price |
|---|---|---|---|
| August 17, 2018 | DKS Sep 21 2018 34.0 Put | 10 | $1.20 |
| August 20, 2018 | DKS Sep 21 2018 34.0 Put | 40 | $0.95 |
| August 24, 2018 | DKS Sep 21 2018 34.0 Put | 25 | $1.25 |
| August 27, 2018 | DKS Sep 21 2018 38.0 Put | 25 | $3.30 |

27. Sullivan also purchased other put options during the August 2018 trading blackout period, which he sold for a loss prior to Dick's August 29, 2018 public earnings announcement. Those trades are not included in the chart above.

28. On August 29, 2018, prior to the opening of the markets, Dick's held its public Q2 2018 earnings call. As announced on the call, Dick's sales figures failed to meet market expectations and Dick's stock price reacted negatively. Following the announcement, Dick's stock price opened 9.8% lower ($32.82) than its previous day close ($36.39).

29. Sullivan sold his entire Dick's put options position on the morning of August 29, just after the markets opened, for realized profits of $11,500.

***Sullivan's Q3 2019 Trades***

30. In February 2019, Sullivan was promoted to Senior Financial Planner in Dick's Finance Department. Sullivan's responsibilities included providing: sales revenue and sales margins for Dick's private-label brands; metrics for quarterly revenue for the private-label brands; sales forecasts; and the private-label brands' sales penetration numbers. Sullivan understood that the numbers he reported on were used by Dick's Finance Department and Investor Relations Department for quarterly business updates, including the quarterly earnings updates to Wall Street.

31. On October 18, 2019, Sullivan received the blackout period notification through his Dick's e-mail account.

32. Dick's Q3 2019 closed on November 2, 2019. Earnings were not announced until November 26, 2019. During this time period, Sullivan was in possession of non-public sales information that would later be included in Dick's Q3 2019 public earnings announcement.

33. For Q3 2019, Sullivan knew Dick's sales data for Q3 2019 while that information was non-public. Sullivan was responsible, in his new role in the Finance Department, for the private-label comparative sales figure and the penetration update for the earnings binder. Sullivan knew that the earnings binder was used to create the Q3 2019 earnings script for Dick's public earnings call. Less than a week after Q3 2019 closed, Sullivan directly provided the private-label sales number for the earnings binder.

34. While in possession of this information, Sullivan purchased a number of Dick's call options, effectively betting that Dick's stock price would increase. In total, Sullivan purchased 132 call option contracts and spent more than $25,160, including trades made on margin, to put on his position.

35. Sullivan purchased the following call options from November 8 (the day he provided the private-label comparative figure for the earnings binder) to November 25, 2019 (the day before Q3 2019 earnings were announced), all while subject to Dick's blackout period and in possession of material, non-public information:

| Date | Option Purchased | Quantity | Price (Avg.) |
|---|---|---|---|
| **November 8, 2019** | DKS Dec 20 2019 40.0 Call | 10 | $2.78 |
| **November 8, 2019** | DKS Dec 20 2019 41.0 Call | 25 | $2.29 |
| **November 12, 2019** | DKS Dec 20 2019 41.0 Call | 11 | $1.70 |
| **November 19, 2019** | DKS Dec 20 2019 40.0 Call | 10 | $2.20 |
| **November 22, 2019** | DKS Dec 20 2019 40.0 Call | 20 | $1.92 |
| **November 22, 2019** | DKS Dec 20 2019 41.0 Call | 36 | $1.40 |
| **November 25, 2019** | DKS Nov 29 2019 39.0 Call | 20 | $1.90 |

36. For all of the orders, Sullivan set limit orders to sell the call options when they reached a certain price. Sullivan set all of the limit orders to authorize sales only when the securities reached a price significantly higher than the price he paid for them.

37. On November 26, 2019, prior to the opening of the markets, Dick's issued its Q3 2019 earnings information. Both Dick's sales and earnings surpassed consensus estimates. On the Q3 2019 earnings call, Dick's CEO made a number of specific references to the private-label brands stating that they were "a key source of strength and differentiation" and that the company was "very pleased" with its private-label brands sales penetration. Dick's stock price reacted particularly positively to the earnings announcement. Following the announcement, Dick's stock price soared. Dick's stock closed more than 18% higher ($46.77) than its previous day close ($39.43).

38. Sullivan sold his entire Dick's call options position on the morning of November 26, 2019, just after the markets opened, for realized profits of $26,235.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

39. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 38, inclusive, as if fully set forth herein.

40. Sullivan knew, or was reckless in not knowing, that he was in possession of material, nonpublic information concerning Dick's quarterly sales figures for Q2 2018 and Q3 2019.

41. Sullivan also knew, or was reckless in not knowing, that he owed a duty to Dick's and its shareholders.

42. By purchasing Dick's securities in the form of options on its common stock, Sullivan traded on the basis of material, non-public information in breach of his duty to Dick's.

43. By reason of the actions alleged herein, Sullivan violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*], and unless restrained and enjoined will continue to do so.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*];

**III.**

Ordering Defendant to pay a civil penalty pursuant to Section 21A of the Exchange Act.[*15 U.S.C. § 78u-1*]; and

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated: November 20, 2020　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　　/s Matt Reilly

　　　　　　　　　　　　　　　　　　　　Matt Reilly
　　　　　　　　　　　　　　　　　　　　Kevin Guerrero
　　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiff*
　　　　　　　　　　　　　　　　　　　　U.S. SECURITIES AND EXCHANGE COMMISSION
　　　　　　　　　　　　　　　　　　　　100 F Street, N.E.
　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20549
　　　　　　　　　　　　　　　　　　　　Tel: (202) 551-5478
　　　　　　　　　　　　　　　　　　　　reillym@sec.gov