IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELANIE ACKERMAN<br>144 Meadow Gap Drive<br>Monroeville, PA 15146<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>WILKINSBURG SCHOOL DISTRICT<br>718 Wallace Avenue<br>Wilkinsburg, PA 15221<br><br>　　　　　　Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br>No.<br><br>JURY TRIAL DEMANDED |

**CIVIL ACTION COMPLAINT**

Plaintiff, Melanie Ackerman, by and through her undersigned counsel, hereby files this Civil Action Complaint, and hereby avers as follows:

## I.  Introduction

1. Plaintiff, Melanie Ackerman (hereinafter "Plaintiff"), initiates this action to seek redress against Defendant, Wilkinsburg School District, for retaliation under the Americans with Disabilities Act of 1990 ("ADA"), retaliation under the Age Discrimination in Employment Act of 1967 ("ADEA"), and the Family and Medical Leave Act of 1993 ("FMLA").

## II.  Jurisdiction and Venue

2. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

3. The Court may properly maintain personal jurisdiction over Defendant because the Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice,

satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

4. The United States District Court for the Western District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

5. The Court may also maintain supplemental jurisdiction over state law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction in that they form part of the same case or controversy.

6. Venue is properly laid in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendant is located in and conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

### III.    Parties

7. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

8. Plaintiff, Melanie Ackerman, is an adult individual currently residing at the above address.

9. Defendant, Wilkinsburg School District, is a municipal subdivision of Wilkinsburg Borough, created and existing pursuant to the laws of the Commonwealth of Pennsylvania with a principal place of business at the above address.

10. At all times relevant herein, Defendant acted or failed to act through its agents, servants, and employees, each of whom was in the scope of their employment at all times relevant herein.

11. Defendant is an "employer" within the meaning of the Family and Medical Leave Act and the Age Discrimination in Employment Act because it maintains over fifty (50) or more employees for each working day in each of twenty (20) or more weeks in the current or preceding calendar year.

12. Defendant is an "employer" within the meaning of the Americans with Disabilities Act because it is engaged in an industry affecting interstate commerce and because it maintains or maintained fifteen (15) or more employees for each working day in each of twenty (20) or more weeks in the current or preceding years.

13. Defendant also maintains sufficient employees to satisfy the jurisdictional prerequisites of the Pennsylvania Human Relations Act (requiring four or more employees).

## IV. Procedural and Administrative Requirements

14. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

15. Plaintiff has satisfied the procedural and administrative requirements for proceeding under the ADA, the ADEA, the FMLA, and the Pennsylvania Human Relations Act as follows:

    a. On June 22, 2020, Plaintiff filed EEOC complaint for retaliation.

    b. This Complaint was docketed as 530-2020-05575.

    c. Plaintiff received her Right to Sue on September 8, 2020.

    d. This action has been initiated within ninety (90) days from receipt of this Right to Sue.

16. Plaintiff has exhausted her federal and state administrative remedies as to the allegations of this Complaint.

## V. Factual Background

17. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

18. Plaintiff hereby incorporates all of the foregoing paragraphs as if set forth at length.

19. Plaintiff has two teaching certificates: Elementary, K-8, and Early Childhood Newborn – 3.

20. Plaintiff has worked in the School District for over twenty (20) years.

21. Plaintiff, during that time, has witnessed and been a part of dozens of transitions that the School District has implemented since 1999.

22. Plaintiff witnessed the Johnston School close forever.

23. Plaintiff was transferred to Turner Elementary on Laketon Road.

24. Then, two years later, the Turner school was moved to an empty high school.

25. This last school year, Plaintiff was transferred back to the 20 plus year old trailers as a second-grade teacher at Kelly Primary School on Kelly Avenue.

26. During Plaintiff's tenure, the District Superintendent leadership has changed over eight (8) times.

27. Plaintiff has had at least ten (10) principals since 1999.

28. Plaintiff has, despite the disruptions, consistently earned satisfactory and proficient evaluations through those years, with the exception of Tanya Smith ("Smith").

29. Grievances have been filed by the union on Plaintiff's behalf and all her negative assessments were discovered to be unfounded.

30. Smith tried to give Plaintiff a negative score because she said she did not like the clothes Plaintiff was wearing.

31. Despite leadership changes, Plaintiff has always been committed to the Wilkinsburg School District and to her students, families, and fellow teachers.

32. Plaintiff has been an integral part of the Wilkinsburg community, participating in afterschool programs, working in their summer programs as a teacher, afterschool programs as a tutor,

creating a parent/ child support program afterschool ("Johnston"), being a part of school events, art shows, holiday family events, music performances, and working with the adult women in the community teaching them beginning yoga through the family support program.

33. Plaintiff also has volunteered to work extra duties in the morning, recess, lunch, and dismissal in order to support school routines and to get to know all of the students not just those in her own classroom.

34. Plaintiff has continued to stay close to the parents and families in her classroom from years past to the current date.

35. Long before emails, Plaintiff would call and send notes and letters to stay connected with parents to let them know how their children were doing.

36. Now Plaintiff also sends emails and even shares her personal cell number in order for parents to call and/ or text during the school day and after school hours.

37. Plaintiff constantly looks for the small and large successes of her students and herself and believes in sharing has successes, not just her concerns.

38. Teachers are required to participate in professional development.

39. The school district provided professional developments in curriculum development, language arts, math, science and social studies, data collection, interpretation and implementation, collaboration, trauma and abuse, truancy, support services and special education.

40. The hours of professional development are now tracked on the Pennsylvania education website.

41. Plaintiff has always met and exceeded all of the requirements.

42. Professional development throughout the years was also completed on her personal time.

43. Plaintiff has never wavered from her commitment of substantial personal contributions to her students.

44. On January 31, 2018, after over sixty (60) hours of research, interviews and after completing the application process, Plaintiff applied for a highly competitive grant titled "Funds for Teachers."

45. Plaintiff was the team leader and was responsible for every detail of the grant.

46. Plaintiff and another teacher traveled throughout Italy for sixteen (16) days as members of The Creativity Workshop, writing and art, and spent meaningful time with African immigrants who were struggling with trauma.

47. Plaintiff also interviewed master artists, writers, and travelers.

48. Plaintiff learned about the programs as, "Make Art Not Walls," spent time traveling throughout the Country making personal connections and gained a profound understanding of how knowledge of family heritage and history builds confidence and self-awareness.

49. Plaintiff and her fellow teacher created a long term, scaffold plan to address their students, parents, and the community. This year, after reaching out to the Pittsburgh arts and literacy community, two second grade classes had the opportunity to visit the Frick Art museum once a month.

50. Storytelling, literacy, self-expression were part of every visit in the students who struggle in the classroom were engaged and learn academic and social skills on these visits.

51. During the first five (5) years of her employment, Plaintiff received her bonus incentive for taking less than three days off.

52. During the spring semester of 2016, Plaintiff took some time off for health issues.

53. The following year, 2017, Plaintiff was involuntarily transferred to the second grade by the Turner School principal, Tanya Smith.

54. This transfer was filed as a grievance by Plaintiff's union and the transfer was placed in abeyance.

55. For twenty (20) years, Plaintiff has started the school year early, setting up her classroom and staying after school hours to work with others on projects and to handle her own professional responsibilities.

56. In 2018- to 2019, the School District decided to restructure and grades Pre-K through 2nd grade and they were assigned to Kelly Primary.

57. Grades 3 6 through were assigned to the high school building, Turner Intermediate. (The high school students were enrolled in the Pittsburgh Public Schools while the Turner building was being remodeled and updated).

58. The second-grade classrooms were assigned to trailers outside of the building.

59. Plaintiff began the school year with a real sense of excitement about the start of the school year.

60. Plaintiff was working in a new building, with a new team and a new principal. Ms. Kerry Francis had held the position as a principal for many years and Plaintiff was looking forward to working with her.

61. Ms. Francis was a supportive and fair-minded principal during the days and months prior to November 29, 2018.

62. Ms. Francis verbally expressed how well Plaintiff's formal observation on November 20, 2018 had gone and even posted photos of the observation with the title, "Good things Happening at Kelly School."

63. On November 29, 2018, Plaintiff fractured three of her ribs.

64. However, she still reported to work and finish the day despite her horrible pain.

65. Plaintiff was later informed she should have gone to hospital since these fractures were a dangerous medical situation. Plaintiff specifically requested accommodations, as a result of her injury, from the School District but these were refused, and she was told not to return until her doctor had cleared her entirely.

66. As a consequence, Plaintiff took FMLA and used her personal sick days.

67. Following Plaintiff's return from FMLA, she was immediately written up in the system for such things as "How will she reconnect with my students?" and not completing her interims while on FMLA, and having the wrong dates on lesson plans.

68. In short, Plaintiff was retaliated against for being on FMLA and for having been disabled.

69. Ms. Francis and the Early Childhood Director, Summer Pendro, placed Plaintiff on an improvement plan starting on the first day of her returning to work, January 10, 2019.

70. At their first meeting, Plaintiff was told that this was the plan of action to help a transition back into the classroom.

71. Acting Principal at Turner Elementary from April 2018 to June 2018, Shawn Johnston, lowered Plaintiff's proficient score of "2" from the observation scores Tanya Smith had completed on February 2018.

72. Ms. Johnston gave Plaintiff a "needs improvement score of 1" as her 2017 to 2018 year end evaluation.

73. Ms. Francis never completed her scores from Plaintiff's positive evaluation on November 20, 2018 but suspiciously, offered her feedback within two hours of receiving Plaintiff's medical clearance from the School District's HR department.

74. The "feedback" was all negative and filled with subjective opinions.

75. When asked by Plaintiff to provide the data to back up her opinion, she was unable to provided either to Plaintiff or to her union representative.

76. Plaintiff's observation was finalized with scores in ninety percent or more of all the subcategories as a need's improvement.

77. Plaintiff filed her original complaint in federal court on or about October 18, 2019.

78. That complaint sounded in, inter alia, discrimination on the bases of violations of the ADEA and the ADA.

79. Further, Plaintiff previously filed an EEOC complaint against Defendant.

80. This EEOC Complaint was docketed at 530-2019-03305.

81. Since that EEOC complaint was docketed, Plaintiff has been retaliated against by the Defendant.

82. Plaintiff's most recent annual evaluation was for the 2019 to 2020 school year.

83. This was completed by the current principal Joe Maluchnik.

84. However, much of this year was online due to COVID-19.

85. Plaintiff sat down with Maluchnik to discuss Plaintiff's improvement plan.

86. Maluchnik informed Plaintiff that he could not provide her with an updated evaluation for that year, per school district policy during COVID

87. Maluchnik told Plaintiff that her classroom was "loose."

88. Maluchnik admitted that he had not reviewed data for Plaintiff's class.

89. Maluchnik admitted that he had not reviewed any documentation to determine whether Plaintiff's class had or had not been learning.

90. Maluchnik gave this as the reason why the Plaintiff's 2019 to 2020 evaluation was exactly the same as her 2018 to 2019 evaluation, despite an entire year elapsing in which Plaintiff made significant efforts to improve.

91. Notably, the 2018 to 2019 evaluation was done by Kerry Francis, the principal before Maluchnik.

92. Evaluation rating forms are not usually completed until January.

93. January is also the month in which they are due.

94. Shawn Johnson completed Plaintiff's evaluation only after having been principal for six (6) weeks of the 2018 school year.

95. However, Shawn Johnston had regularly requested Plaintiff's assistance with students with behavior challenges.

96. Shawn Johnston had also offered Plaintiff public praise for her fellowship, and for her classroom activities and her climate.

97. The Principal before Johnston was Tanya Smith.

98. Tanya Smith was Principal for a majority of 2017 to 2018.

99. Tanya Smith gave the Plaintiff solid and proficient observations.

100. Tanya Smith, who is now deceased, left in April 2018.

101. Shawn Johnson was hired to replace her.

102. Despite only becoming Principal in April 2018, Shawn Johnson did Plaintiff's evaluation for the 2017 to 2018 school year.

103. Instead of completing Plaintiff's evaluation at the end of June, which is customary, she did so on January 17, 2019.

104. Shawn Johnston rated Plaintiff "needs improvement" and satisfactory, despite Plaintiff having had no negative feedback during that time.

105. Plaintiff received one write-up on PAETEP on April 30, 2018 from Dr. Cathleen Cubelic (Assistant to the Superintendent) praising her for her professional development.

106. This writeup originated from when Plaintiff applied for, and was awarded, a grant from outside the school district.

107. Plaintiff was awarded $10,000 to travel to Italy for sixteen days to understand literacy and learn new education techniques.

108. Later, Plaintiff was able to receive another grant allowing her to take her students (with no charge to them) on monthly field trips to the local Frick Art Museum.

109. These trips cost the school nothing and was a great opportunity for the students, many of whom came from low income and at-risk families.

110. While Plaintiff was on medical leave following her fall, all the field trips Plaintiff had submitted requests for were approved.

111. However, Kerry Francis soon deleted all these approvals and told Plaintiff that she had to reapply for all of them, and that they could only restart in February and March 2019.

112. By virtue of the cancellations, for which no reason was given, Kerry Francis interfered with Plaintiff's professional development and her professional development score suffered accordingly.

113. Further, Plaintiff spent one summer creating a common core assessments and pacing chart for both second grade Language Arts and Mathematics for the District.

114. While Plaintiff was paid for forty hours (which was the cap), she worked on the assessment for over eighty hours, but was never once was she recognized by the administration for her work.

115. Kerry Francis did Plaintiff's evaluation seven days and a year later.

116. Kerry Francis finished her observation on January 8, 2019, and noted Plaintiff needed improvement in a majority of areas covered.

117. In particular, Plaintiff had evaluated herself as "distinguished" in the category of evaluation of "Participating in a Professional Community."

118. Plaintiff supported the self-evaluation by virtue of her work with Kristen Carrey and the Funds for Teachers fellowship.

119. Plaintiff's work with the Frick Art Museum.

120. Plaintiff's contacts with Bricolage.

121. All of the foregoing should have been evaluated with respect to communication skills and listening.

122. Kerry Francis instead evaluated Plaintiff's performance as needing improvement but left neither comments no suggestions.

123. Notably, prior to Plaintiff's November 2018 fall, she had a good relationship with Kerry Francis.

124. Just before the fall, on November 20, Kerry Francis posted several pictures of Plaintiff's classroom to Plaintiff's personal Facebook profile with the caption "Great things happening at Kelly Primary!"

125. In one of those pictures, a history lesson plan was on the board which Kerry Francis later rated Petitioner as needing improvement on.

126. On another occasion, immediately following Plaintiff's fall, Kerry Francis told Plaintiff in a text conversation that Plaintiff was "so sweet," that she loved working with her, and that she gave Ms. Francis "a sense of calmness."

127. Ms. Francis additionally told Plaintiff that they would "figure it out" and that the Plaintiff should "rest, rest, rest."

128. On information and belief, the sudden negative feedback originated from a meeting between Kerry Francis and the superintendent, Dr. Iverson (or even higher up) in which Dr. Iverson required Kerry Francis to give Plaintiff "needs improvement" evaluations.

129. On information and belief, Dr. Iverson's animus towards Plaintiff stems from Plaintiff's FMLA when she requested modifications and accommodations after her injury, rather than to completely stay home on medical leave.

130. On information and belief, Dr. Iverson likely felt challenged and told Plaintiff to stay at home instead.

131. Notably, Dr. Iverson was hired with the intention to mentor teachers to be better.

132. However, Doctor Iverson's style of mentoring has been to terminate teachers.

133. Doctor Iverson's automatic reaction to any negative feedback has been to place staff on improvement plans.

134. During 2018 to 2019, out of the school's four second grade teachers, three were placed on an improvement plan (Petitioner, Amber Hensley, and another was taken off of it at the end of the school year).

135. Plaintiff was placed on an improvement plan immediately upon her return from FMLA and has been on one ever since.

136. Plaintiff has been on a continuous improvement plan over the last three years.

137. After one school event, Superintendent Linda Iverson, sent an email thanking the entire staff, with the exception of only Plaintiff and Amber Hensley.

138. Student learning objectives (or SLOs) account for fifteen percent of a teacher's 82 rating.

139. Plaintiff submitted her SLOs for 2018 to 2019 on June 17, 2019, but through technology errors it only scanned the first page and sent that in.

140. When Plaintiff realized the mistake, she immediately sent the new one, but Kerry Francis refused to acknowledge it and instead gave the Plaintiff a zero because she only counted the first page and cited, "no evidence."

141. Plaintiff's classroom in 2018 to 2019 was in a trailer, along with the other second grade classrooms.

142. Dr. Iverson informed the teachers during a staff development that they were moving to another building since trailers are not conducive to learning.

143. Plaintiff was once written up because her "subtub" (packet of materials left for the substitute teacher) was on the left side of her desk rather than the right side. She was cited as "showing insubordination."

144. When Plaintiff was placed in the trailer, she was not given a desk, but instead two tables which she placed in an "L" shape.

145. One of one of the desks was uneven, and there was a paper folded underneath to stabilize it.

146. While Plaintiff was gone on FMLA, it collapsed.

147. Defendant emptied out Plaintiff's drawers and finally gave her a new desk, which she had been requesting for a while.

148. However, all the property was taken out.

149. Further, the coat rack shelf collapsed while Plaintiff was on FMLA because a substitute teacher hung too much weight on it.

150. Plaintiff was blamed for as the collapse because she was allegedly "disorganized."

151. In the same way, Plaintiff was blamed for the behavior of her class while she was on medical leave.

152. Before Plaintiff's fall, Kerry Francis did a very positive observation of her class, but did not complete it.

153. When it was finally completed in early January (two months after the original observation took place on November 13, 2018), it was negative.

154. Plaintiff noted that she specifically emailed Kerry Francis asking for advice to get off the improvement plan but was met with the reference to read the (derogatory) PAETEP comments.

155. Kerry Francis made a point of observing Plaintiff only when no other staff were present.

156. Plaintiff was observed nearly every week at one point, and one of her students once asked her if she was going to get fired.

157. Plaintiff estimates that she has endured nearly fifty (50) observations since Fall 2019 due to her improvement plan.

158. This number far exceeds the standard amount of observations normally utilized for second grade teachers at Kelly Primary.

159. The PAETEP system, used by the entire Commonwealth of Pennsylvania, is specifically programmed so that neither notifications nor comments can ever be deleted.

160. Plaintiff indicated that the school has had issues with disabled teachers before.

161. In particular Plaintiff cited female teachers with "brain issues."

162. Plaintiff was recently informed by Stacey Mazak, the Union President, that she had the most grievances out of any teacher in the District by far.

## Count I
### FMLA – Retaliation

163. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

164. Defendant is an "employer" as defined by the Family Medical Leave Act, within the definition set forth in 29 U.S.C. Sec. 2611(4)(A)(i)-(iii).

165. Defendant is engaged in commerce or in an industry or activity affecting commerce which employs fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

166. After Plaintiff returned from FMLA, as aforesaid, she was treated in a discriminatory manner and continues to be so treated for no legitimate reason.

167. The foregoing conduct by the Defendant constitutes a violation of the FMLA, in that the Defendant retaliated against the Plaintiff for taking FMLA in violation of 29 U.S.C. Sec. 2615(a)(2).

168. As a result of Defendant's violations of the FMLA, Plaintiff has suffered damages as set forth herein.

## Count II
### Americans with Disabilities Act – Retaliation

169. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth as length.

170. Once Plaintiff returned from recuperating from her disability, she was immediately retaliated against and continues to be retaliated against, as set forth in detail *supra*.

171. Defendant retaliated against Plaintiff because she had returned from recuperating from her disability.

172. Plaintiff complained about this retaliation in her EEOC complaint filed on June 22, 2020.

173. Defendant violated the Americans with Disabilities Act.

174. As a result of Defendant's violations of the ADA, Plaintiff has suffered damages as set forth herein.

   *WHEREFORE*, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra.*

### Count III
### ADEA – Retaliation

175. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

176. Defendant took adverse employment actions against Plaintiff as set forth in detail hereinabove.

177. Plaintiff has opposed unlawful practices regarding her age by filing her recent EEOC complaint for retaliation and, prior to that filing an EEOC complaint and later, a federal complaint.

178. Plaintiff, by these actions, put the Defendant on notice that she believed she was a victim of unlawful age discrimination under the ADEA.

179. As a direct consequence of her complaints about age discrimination, she was further retaliated against and suffered discriminatory treatment different from her fellow employees who engaged in similar conduct.

180. Further, Defendant specifically singled out Plaintiff for discriminatory treatment, by virtue of her age without any legitimate business reason for doing so.

181. As a result of the Defendant's retaliation, Plaintiff has suffered damages as set forth herein.

   *WHEREFORE*, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## *AD DAMNUM* CLAUSE/PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant and that it enter an Order as follows:

a. Defendant is to be permanently enjoined from discriminating against or harassing Plaintiff on any basis prohibited under applicable federal and/or state law;

b. Defendant is to be permanently enjoined from retaliating against Plaintiff for exercising her right under federal and/or state law;

c. Defendant is to be permanently enjoined from discriminating against or harassing Plaintiff, or any other employee, on the basis of her disability (or perceived disability) or any other basis prohibited under federal or state law;

d. Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of retaliating against employees who complain about disability discrimination and harassment, and is to be ordered to promulgate an effective policy against such retaliation and to adhere thereto;

e. Defendant is to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered discrimination and/or harassment at the hands of Defendant until the date of verdict;

f. Plaintiff is to be awarded actual damages caused to her by Defendant's actions;

g. Plaintiff is to be awarded liquidated and./or punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or any other employees from engaging in such misconduct in the future;

h. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

i. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

j. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law;

k. Plaintiff is to be granted such additional injunctive or other relief as he may request during the pendency of this action in an effort to ensure Defendant does not engage – or ceases engaging - in illegal retaliation against Plaintiff or other witnesses to this action;

l. That the Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein;

m. Plaintiff's claims against Defendants are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand

on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

        Respectfully submitted,

        KOLMAN LAW P.C

By:   /s/ Timothy M. Kolman
      Timothy M. Kolman, Esquire
      Sarah A. Biscoe, Esquire
      Attorneys for Plaintiff
      414 Hulmeville Avenue
      Penndel, PA 19047
      (215) 750-3134

Dated: December 2, 2020