**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PNC FINANCIAL SERVICES GROUP, INC., | |
| Plaintiff, | Civil Action No. _____ |
| v. | *Document Electronically Filed* |
| PLAID INC., | |
| Defendant. | |

**COMPLAINT FOR TRADEMARK COUNTERFEITING,**
**TRADEMARK INFRINGEMENT, FALSE DESIGNATION**
**OF ORIGIN, FALSE ADVERTISING, AND UNFAIR COMPETITION**

Plaintiff The The PNC Financial Services Group, Inc. ("PNC") by its undersigned attorneys alleges as follows, upon actual knowledge with respect to its itself and its own acts, and upon information and belief as to all other matters:

**THE PARTIES**

1.      PNC is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at The Tower at PNC Plaza, 300 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

2.      Upon information and belief, Plaid Inc. is a Delaware corporation with its principal place of business at 85 Second Street, Suite 400, San Francisco, California 94105.

**NATURE OF THE ACTION**

3.      This is an action for trademark counterfeiting, trademark infringement, false designation of origin, false advertising, and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq*. and Pennsylvania statutory and common law.

1

4.      PNC brings this action because Defendant Plaid Inc. has sought to obtain trust and consumer confidence from consumers by intentionally designing user interfaces to misleadingly suggest that Plaid was affiliated or associated with, or sponsored by, PNC.  Initially, Plaid created a user interface for financial services applications that, without authorization, used the PNC trademark, the  logo, and PNC's orange-and-blue color scheme to replicate a genuine PNC login page in order to mislead consumers into believing they are entering their sensitive personal and financial information in PNC's trusted and secure platform or a platform that is otherwise associated or affiliated with, or sponsored by, PNC.  Below are the genuine PNC mobile app login page, which is depicted on the left, and Defendant's original fake "PNC" mobile app login page, which is depicted on the right.



Genuine PNC Login Page                    Defendant's Fake "PNC" Login Page

5.      Upon information and belief, due to the consumer confusion caused by Plaid's unlawful infringement of the trademarks and branding of PNC and other financial institutions, Plaid recently introduced a revised user interface that nevertheless continues to infringe PNC's trademark rights as set forth below.

6.      Upon information and belief, Plaid refuses to cease its improper use of PNC's trademarks because it wishes to confuse consumers into believing that Plaid's services are associated or affiliated with PNC to persuade consumers to provide Plaid the consumer's sensitive financial information.  In reality, however, consumers are unwittingly providing their login credentials to Defendant, who takes the information, stores it on its servers, and uses it to mine consumers' bank records for valuable and sensitive data (e.g., personal contact information, account number, transaction histories, loans, etc.), which Defendant then monetizes by selling to third parties and/or leverages for services it sells to third parties.  Defendant's unscrupulous practices are the subject of a separate consolidated consumer class action in *Cottle v. Plaid Inc.*, No. 3:20-cv-03056 (N.D. Cal. filed May 4, 2020), alleging that Defendant deceptively and fraudulently collects, stores, aggregates, and monetizes consumers' sensitive financial credentials and transactions in violation of consumers' privacy, the Computer Fraud and Abuse Act, and other laws.  A copy of the complaint filed in that lawsuit is attached as Exhibit A.

### JURISDICTION AND VENUE

7.      This action arises under the federal Trademark Act, 15 U.S.C. § 1051, *et. seq.*, and under Pennsylvania statutory and common law.  This Court has subject matter jurisdiction over these claims arising under Federal law pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and (b).  Alternatively, this Court possesses diversity jurisdiction under 28 U.S.C. §

1332 because PNC and Defendant reside in different states—namely Pennsylvania and

California, respectively—and the amount in controversy exceeds $75,000 exclusive of interest

and costs.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over PNC's

state law claims because those claims are substantially related to PNC's federal Lanham Act

claims.

   8. This Court has personal jurisdiction over Defendant and venue is proper in the

Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c) because PNC is being

harmed in this District; Defendant is conducting business in this District; and Defendant is

infringing upon PNC's trademark rights in this District.

**PNC, ITS SERVICES, AND ITS FAMOUS TRADEMARKS**

   9. The product of a merger of two distinguished Pennsylvania banks in 1983

(Pittsburgh National Corporation and Provident National Corporation), PNC's history stretches

back more than 160 years.  Today, PNC is one of the largest diversified financial services

institutions in the United States with 52,000 employees across more than 40 states and assets of

$445 billion as of March 31, 2020.  PNC offers a broad array of retail banking (including

residential mortgage), corporate and institutional banking, and asset management products and

services.

   10. With approximately 2,300 retail branches around the country servicing millions of

customers, PNC is one of the best-known banks in the United States.  In recent years, PNC has

grown its customer base beyond its physical retail branch network through digital channels and

industry-leading online banking services.

PNC's Trademarks

11.     PNC has used the name and trademark PNC® in the U.S.—alone and with other word and/or design elements—since at least as early as April 15, 1976 to identify its suite of financial services.



12.     PNC has used its iconic logo  ("PNC Logo") alone and together with the PNC® mark in various formats since at least March 15, 2000 to identify its suite of financial services.

13.     PNC frequently displays its PNC Logo together with the PNC® mark in vertical

and horizontal formats as shown here:          and                 to designate the source of its various financial services.

14.     PNC owns many federal registrations for its PNC® mark and PNC Logo – individually, together, and combined with other word and design elements (collectively the "PNC Marks"), for a variety of financial, banking, data processing, and online banking services, including:

| Mark | Reg. No. Reg. Date | Products/Services |
|---|---|---|
| PNC | 1416898 11-11-1986 | Various banking and financial services, including data processing services |
| PNC | 2508843 11-20-2001 | Full line of banking and financial services |
|  | 2665477 12-24-2002 | Full line of banking and financial services |
| PNC.COM | 5831730 08-13-2019 | Various banking and financial services |

5

| Mark | Reg. No.<br>Reg. Date | Products/Services |
|---|---|---|
| PNC CONTROL HUB | 6003441<br>03-03-2020 | Banking services; mobile banking services; online banking services; banking services accessible by means of online software and a mobile application that features user-controlled account security and accessibility. |
| PNC DIGITAL ADVISOR | 5758596<br>05-21-2019 | Providing online financial advice and consulting |
| PNC PAY | 5509205<br>07-03-2018 | Banking services; financial services, namely, providing financial payment and transaction options in the nature of commercial transactions and payment options using a mobile device; banking and financial services in the nature of providing financial payment and transaction processing services of commercial transactions accessible by means of a downloadable mobile application |
| VIRTUAL WALLET BY PNC BANK | 3803702<br>06-15-2010 | Banking services; on-line banking services; bill payment services provided through a website |

Printouts of these registrations, taken from the U.S. Patent and Trademark Office's online database, are attached as Exhibit B.

15.    In addition to the distinctive PNC Marks, PNC has used orange and blue as its primary corporate colors for decades, which have been continuously and prominently used with, in, and throughout PNC's marks, website, advertisements, promotions, branches, and mobile banking app (see examples below):





PNC's Online and Mobile Banking Services

16.     PNC customers can access their accounts online via PNC's website and mobile app.  There, consumers can view and manage their accounts, deposit checks, pay bills, transfer and send money, and more.

17.     When consumers access their PNC accounts online, they are presented with a login screen with the PNC name, mark, and logo, where they enter their user ID and password. Similarly, when consumers access their PNC mobile banking apps, they are presented with a login screen bearing the PNC hallmarks, including the PNC name, mark, logo, and color scheme:



18.     Given the confidential nature of a consumer's personal and financial information, and the ever-increasing risk of identity theft, PNC employs robust security protocols to safeguard its customers' privacy and the security of their financial information entered or visible online and through PNC's mobile apps.  Consumers have come to trust and rely on these and other measures to protect their identities, hard-earned money, and sensitive and valuable financial information.

<u>The Fame and Goodwill of the PNC Brand</u>

19.     For years, PNC has extensively advertised, marketed, and promoted its PNC-branded services through a variety of high-profile national media, including television, Internet, and print advertisements.  PNC has also received widespread coverage in national media outlets.

20.     Over the years, PNC has also received numerous corporate and business awards, including:

- *Fortune 500* list of America's largest companies
- *Fortune's* list of World's Most Admired Companies (2020)
- Euromoney Awards for Excellent, Best United States Bank (2020)
- Kiplinger list of Best National Banks (2020)
- 50 Most Engaged Workplaces™, Achievers (2018)
- Most Admired for HR, Human Resource Executive magazine (2018)
- 50 Happiest Companies in America, CareerBliss (2018)
- Best Places to Work for LGBTQ Equality, Human Rights Campaign (2019)
- Top 70 Companies for Executive Women, National Association for Female Executives (2019)
- 100% Score on the 2019 Disability Equality Index® (DEI®) Best Places to Work™
- The Most Powerful Women in Banking and Finance, American Banker (2018)
- 50 Best Companies for Diversity, Black Enterprise magazine (2018)
- Best of the Best Top Veteran-Friendly Companies, U.S. Veterans Magazine (2019)
- Corporate Citizenship Award, Pittsburgh Business Times (2017)

Additional representative examples of recognition to PNC for its commitment to excellence, social responsibility, diversity, and inclusion can be found at https://www.pnc.com/en/about-pnc/media/awards-and-recognition.html.

21.     The PNC Marks have become well-known and famous by virtue of extensive public exposure and the tremendous success of PNC's products and services.

## DEFENDANT AND ITS WRONGFUL ACTS

22.     Defendant offers a financial technology infrastructure product consisting of software and a user interface that connects third-party financial services applications ("apps") to consumers' bank accounts.  Specifically, when connecting a third-party app to consumers' bank

accounts, Defendant's Plaid product used an authentication process that attempted to bypass PNC's customary authentication process.  As a result, PNC was required to institute a process in order to authenticate and validate traffic originating from Plaid to apply controls to protect sensitive consumer information and data.

23.     Instead of redirecting consumers from the third-party app to their bank's website or app, the Plaid product's authentication attempted to sidestep PNC's process by creating fake login screens that replicate the banks' login pages, giving consumers the false impression that they have been transported to their bank's website or app and are logging into their account.  In reality, consumers are giving their login credentials to Defendant, which then uses the information to log into the banks' systems in order to extract consumer data on a systematic basis with the consumer's knowledge.  Indeed, upon information and belief, Plaid continues to extract consumer data even if the consumer deleted the app that utilizes the Plaid product.

24.     Defendant's Plaid product is used in several popular payment and investment apps, including *Venmo*, *Coinbase* and Square's *Cash App*, each of which allows consumers to send and receive money from their PNC and other financial accounts.

<u>Plaid's First Infringing User Interface</u>

25.     To demonstrate how this process works on one of the apps supported by Defendant, below are screenshots from the Coinbase app showing how users "automatically" linked their PNC accounts to Coinbase through Defendant's fake "PNC" login pages:

11
















26.     Once consumers' login credentials were obtained through this deception, such

information was sent to Defendant's servers, where it was used to collect data from *all* of

consumers' accessible accounts (e.g., checking, savings, and credit card)—not just the specific

account a customer chose to connect with the third-party app.

27.     The revenues Defendant derived and continues to derive from its unlawful

activities are substantial.  Indeed, Defendant touts that "[o]ver a quarter of people with US bank

accounts" and "tens of millions of users" have financial accounts connected through Plaid.  (See

https://plaid.com/overview-privacy/; https://plaid.com/documents/plaid-for-financial-

institutions.pdf.)  According to Defendant's website, Defendant stores and analyzes "typically 24

months of transaction data, including geolocation, merchant, and category information" using

machine learning.  (See https://plaid.com/products/transactions/.)  Defendant sells this highly

valuable personal financial information to third-party apps for monetary gain.  (See

https://plaid.com/pricing/.)

28.     Although the above screens display the PNC logo and PNC's orange-and-blue

color scheme, they were in fact fake "PNC" screens created by Defendant to dupe consumers

into believing that they are interacting directly with PNC.

29.     Plaid replicated the authentic PNC log-on screen in order to intentionally mislead

consumers into believing that they are providing their private and sensitive information to PNC

or to an entity affiliated with PNC in order to overcome the otherwise present and reasonable

apprehension to providing financial information to an unknown third-party.

30.     Defendant openly admits that it obtains consumers' sensitive financial

information by misappropriating bank "branding elements," which give "end-users [] a greater

sense of security and familiarity" because "they recognize their institution's look-and-feel."  (See

https://blog.plaid.com/improved-search/.)  The "native experience" of consumers entering login

credentials on fake screens without ever leaving the original app further "eliminates the barriers

and clunkiness of redirect-based OAuth, increasing user conversion."  (See

https://fin.plaid.com/articles/demystifying-screenless-exchange/.)

31.     In view of Defendant's unlawful activities, PNC implemented additional security

measures to protect consumer's sensitive account information from the risks posed by Plaid's

processes, while continuing to allow consumers to link their accounts directly through a given

fintech app (such as *Venmo*, *Coinbase*, or *Cash App*) by manually inputting their PNC account

number and routing information directly.

32.     In retaliation for PNC instituting such safeguard measures, Defendant placed

misleading statements on its fake "PNC" login pages falsely telling consumers that PNC is

preventing them from linking their accounts in *any* manner and encouraging consumers to file a

complaint with the Consumer Financial Protection Bureau (CFPB).  For instance, Defendant's

infringing user interface previously included the following false and misleading statements on its

fake "PNC" login screens:




33.     The above statements are false and highly misleading in several respects.  The statement that "We're currently experiencing connectivity issues with this bank" falsely states that PNC is experiencing Internet connectivity issues that are preventing consumers from linking their accounts.  Likewise, the statement "PNC has made a change that prevents you from being able to link your accounts" is literally false because PNC has not prevented consumers from linking their accounts with the third-party fintech app by manually inputting their account number and routing information directly.  Defendant's false and misleading statements undermine and damage PNC's reputation as a reliable and trusted financial institution.

34.     Further, the statement appearing on Defendant's fake "PNC" login page that directs customers to file CFPB complaints has resulted in actual consumer confusion, as CFPB complaints have been filed by those who mistakenly believed that it was PNC giving the direction on the PNC login screen to file a complaint with the CFPB.

<u>Plaid's Subsequent Infringing User Interfaces</u>

35.     In November 2020, Plaid began introducing new user interfaces, including those below, and upon information and belief continues to develop and introduce new user interfaces, that continue to infringe PNC's trademark rights by displaying the PNC Marks together with PNC's trademark orange color to falsely suggest that PNC is affiliated, associated, or connected with Plaid:



36.     By unnecessarily including the PNC Logo and PNC's distinctive orange brand color and combining those elements with Plaid's own name and logo, Plaid's new user interface gives consumers the false impression that PNC has endorsed, approved, or sponsored the Plaid platform being used to enter the consumer's private and sensitive financial information.

17

37.     Upon information and belief, additional new user interfaces that Plaid continues to develop and implement improperly use PNC's trademarks and otherwise suggest an affiliation, association, or sponsorship between PNC and Plaid that does not exist.

38.     Upon information and belief, Plaid continues to intentionally infringe PNC's trademarks in order to convince a customer to provide their login information by leveraging a consumer's trust and confidence in PNC's security and privacy protocols by misleading the consumer to believe that PNC is affiliated or associated with Plaid.

**INJURY TO PNC AND THE PUBLIC**

39.     Defendant's unauthorized use of PNC's trademarks and the fake "PNC" login pages that further misappropriate PNC's logos and color schemes are causing confusion and are likely to continue to confuse and deceive consumers into believing that they have been forwarded to PNC's genuine login page and/or that they are providing their login credentials to PNC and not to Defendant or any unauthorized and unaffiliated third party.  Alternatively, consumers are likely to be confused and deceived into believing that Plaid is affiliated or associated with PNC because Plaid's use of PNC's trademarks and brand indicia in its user interface is specifically designed to connote to consumers an affiliation between Plaid and PNC that does not exist.  Further, Defendant's false and misleading statements regarding "connectivity issues" with PNC, and that PNC is preventing consumers from linking their accounts, damage PNC's hard-earned reputation and goodwill as a trusted financial institution dedicated to providing convenient but secure digital banking applications to its customers.

40.     Defendant's unauthorized use of PNC's trademarks and fake "PNC" login pages, along with Defendant's false and misleading statements, are causing confusion and likely to

continue to cause confusion, mistake, and deception as to the source or origin of Defendant, its business, and/or its commercial affiliation with PNC.

41.     Defendant's unauthorized use of PNC's trademarks and fake "PNC" login pages, along with Defendant's false and misleading statements, have damaged and irreparably injured and, if permitted to continue, will further damage and irreparably injure PNC and its  reputation and goodwill.

42.     Defendant intentionally uses the PNC Marks, PNC's color schemes, and fake "PNC" login pages to trick and deceive people into believing that they are at PNC's mobile banking or website, with the purpose of obtaining their valuable and private financial information.  Defendant also intentionally makes false and misleading statements to damage PNC's reputation as a trusted financial institution.  As a result, Defendant has acted knowingly, willfully, in reckless disregard of PNC's rights, and in bad faith.

43.     PNC has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### Federal Trademark Counterfeiting Under
### Sections 32(1)(b), 34(d) of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d)

44.     PNC repeats and realleges each and every allegation set forth in paragraphs 1 through 43 of this Complaint.

45.     Defendant has used and continues to use a counterfeit of PNC's federally registered PNC Marks (including Reg. Nos. 2508843 and 1416898) in connection with the sale, offering for sale, and distribution of online financial services in violation of Sections 32(1)(b), 34(d) of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d).

## SECOND CLAIM FOR RELIEF

**Federal Trademark Infringement Under
Section 32(a) of the Lanham Act,
15 U.S.C. § 1114(1)**

46.     PNC repeats and realleges each and every allegation set forth in paragraphs 1

through 45 of this Complaint.

47.     Without PNC's consent, Defendant has used and continues to use in commerce

reproductions, copies, and colorable imitations of PNC's federally registered PNC Marks in

connection with the offering, distribution, and advertising of services, which has caused and is

likely to continue to cause confusion, or to cause mistake, or to deceive, in violation of Section

32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

## THIRD CLAIM FOR RELIEF

**Federal Trademark Infringement, False Designation
of Origin, and Unfair Competition Under
Section 43(a)(1)(A) of the Lanham Act,
15 U.S.C. § 1125(a)(1)(A)**

48.     PNC repeats and realleges each and every allegation set forth in paragraphs 1

through 47 of this Complaint.

49.     Defendant's actions described above have caused and are likely to continue to

cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendant,

Defendant's services/goods, and/or Defendant's commercial activities by or with PNC, and thus

constitute trademark infringement, false designation of origin, and unfair competition in

violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

Case 2:05-mc-02025   Document 2076   Filed 12/21/20   Page 21 of 25


## FOURTH CLAIM FOR RELIEF

**False Advertising
Section 43(a)(1)(B) of the Lanham Act,
15 U.S.C. § 1125(a)(1)(B)**

50.      PNC repeats and realleges each and every allegation set forth in paragraphs 1

through 49 of this Complaint.

51.      The aforesaid acts of Defendant constitute false and misleading descriptions and

misrepresentations of material fact in commerce which, in commercial advertising and

promotion misrepresent the nature, characteristics, and qualities of PNC's goods, services, and/or

commercial activities.


## FIFTH CLAIM FOR RELIEF

**Unfair Competition and Unfair or Deceptive Acts or Practices Under
73 P.S. § 201-1, *et seq.***

52.      PNC repeats and realleges each and every allegation set forth in paragraphs 1

through 51 of this Complaint.

53.      Defendant's actions described above constitute unfair methods of competition and

unfair or deceptive acts or practices in violation of 73 P.S. §201-1, *et seq.*


## SIXTH CLAIM FOR RELIEF

**Trademark Infringement, Unfair Competition, False Designation of Origin,
and Misappropriation
Under Pennsylvania Common Law**

54.      PNC repeats and realleges each and every allegation set forth in paragraphs 1

through 53 of this Complaint.

55.      Defendant's actions described above have caused and are likely to continue to

cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendant,

Defendant's services/goods, and/or Defendant's commercial activities by or with PNC, and thus

constitute common-law trademark infringement, unfair competition, false designation of origin, and misappropriation of PNC's Marks and goodwill under the common law of Pennsylvania.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, PNC respectfully demands a trial by jury on all issues properly triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, PNC respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it the following relief, including but not limited to:

A.     An Order declaring that Defendant's uses of the PNC Marks knowingly and willfully infringe the PNC Marks, constitute counterfeiting of PNC's registered marks, and constitute unfair competition, as detailed above.

B.     An Order declaring that Defendant's activities as described in Paragraphs 31-33 of this Complaint constitute false and misleading descriptions and misrepresentations of fact in commerce which, in commercial advertising and promotion misrepresent the nature, characteristics, and qualities of PNC's goods, services, and/or commercial activities.

C.     An Order permanently enjoining Defendant, its officers, directors, employees, agents, subsidiaries, distributors, dealers, app partners, related companies, and all persons in active concert or participation with any of them:

1.     From using, registering, or seeking to use or register any name, mark, trade name, company name, domain name, source identifier, or designation comprised of or containing the PNC Marks or any similar term(s) in any manner likely to cause confusion with PNC and/or its marks, mobile app login page, or to

22

otherwise injure PNC and/or its reputation;

    2.     From representing, by any means whatsoever, directly or indirectly, that Defendant, its services/goods, and/or its activities originate from, are sponsored by, or are associated, affiliated, or otherwise connected with PNC in any manner;

    3.     From creating and/or using login and other screens, materials, or imagery that misappropriate or purport to be real PNC screens, materials, or imagery or are otherwise likely to confuse consumers into believing that such login and other screens originate from, are associated or affiliated with, or sponsored by, PNC, including but not limited to the first and second infringing user interfaces depicted above; and

    4.     From assisting, aiding, and/or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs B(1) through (3) above.

D.    An Order requiring Defendant to immediately retract and destroy all products, logins, packaging, signage, advertisements, promotional materials, stationery, forms, and/or materials and things that contain or bear PNC, or any other name, mark, trade name, company name, source identifier, or designation that contains or is confusingly similar to the PNC Marks.

E.    An Order requiring Defendant to display a prominent and conspicuous disclaimer that truthfully and accurately discloses to users that Defendant's services and login pages: (1) are not authorized by and do not have any affiliation or association with PNC and (2) are not a direct secure and protected login communication with PNC free of any unauthorized intermediaries.

F.    An Order requiring Defendant to engage in corrective advertising that notifies all users who linked or connected a PNC bank account with any third-party app through

Defendant's services: (1) that such links or connections were not established directly through PNC; (2) that Defendant obtained, used, sold, and supplied such users' sensitive financial information to others; and (3) that PNC has never prevented consumers from linking their accounts with third-party fintech apps.

G.      An Order directing that, within thirty (30) days after the entry of the injunction, Defendant file with this Court and serve on PNC's attorneys a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

H.      An Order requiring Defendant to account for and pay to PNC all profits arising from Defendant's unlawful acts, and increasing such profits, for payment to PNC in accordance with 15 U.S.C. § 1117 and other applicable laws.

I.      An Order requiring Defendant to pay statutory damages in accordance with 15 U.S.C. § 1117(c) of up to $2,000,000 for each type of service sold, offered for sale, or distributed by Defendant under the registered PNC Marks.

J.      An Order requiring Defendant to pay PNC actual damages, in an amount to be determined (but exceeding $75,000), caused by the foregoing acts, and trebling such damages in accordance with 15 U.S.C. § 1117, 73 P.S. §201-1, *et seq.*, and other applicable laws.

K.      An Order requiring Defendant to pay PNC all of its litigation expenses, including reasonable attorneys' fees and costs under 15 U.S.C. § 1117, 73 P.S. §201-1, *et seq.*, Pennsylvania common law, and other applicable laws.

L.      An Order requiring Defendant to pay PNC punitive damages in an amount to be determined due to the foregoing willful acts.

M.      All other relief as the Court may deem appropriate and just.

Dated: December 21, 2020                          *s/ Jayme L. Butcher*

                                               Jayme L. Butcher
                                               BLANK ROME LLP
     Union Trust Building
     501 Grant Street, Suite 850
     Pittsburgh, PA 15219
     (412) 932-2801 (phone)
     (412) 932-2777 (fax)
     Email: jbutcher@blankrome.com

     Hara K. Jacobs (*pro hac vice* to be filed)
     Noah S. Robbins (*pro hac vice* to be filed)
     BALLARD SPAHR LLP
     1735 Market Street
     51st Floor
     Philadelphia, PA 19103
     (215) 665-8500 (phone)
     (215) 864-8999 (fax)
     Email: jacobsh@ballardspahr.com
     Email: robbinsn@ballardspahr.com